## A90A0034. WILLIAMS v. THE STATE.
(394 SE2d 123)

POPE, Judge.

Appellant Leon Williams was indicted, tried and convicted of three counts of aggravated child molestation and one count each of child molestation, statutory rape, incest and aggravated sodomy, for sexually abusing his thirteen- and fourteen-year-old daughters. He was sentenced to life imprisonment plus 150 years to be served consecutively, and appeals.

The State introduced evidence showing that on November 20, 1987, I. W., the younger victim, reported to a school principal that defendant had been fondling her and had also been having sexual intercourse for some time with her older sister, N. W. The principal immediately notified the State Department of Family & Children's Services, which sent Francis McKnight to interview I. W. Using anatomically correct dolls, I. W. revealed to McKnight that appellant had sexually fondled her since she was five years old, and that she had seen her father have sexual intercourse with N. W. on several occasions. When McKnight went to N. W.'s school to interview her, she told him that defendant had fondled her in the breast and vaginal area since she was five years old, and from the time she was ten had forced her to have sexual intercourse once or twice a week. N. W. said defendant had threatened to kill her if she told anyone, but that she had told her mother on two occasions and her mother did nothing to stop the abuse. N. W. also told McKnight that she had observed defendant having anal intercourse with her older brother, J. W.

McKnight reported this information to the Walker County Sheriff's Department and they obtained a court order allowing DFACS to take the girls into temporary custody. The girls were then taken to the Rossville Police Department to be interviewed, where they gave a detailed account of the years of sexual abuse. N. W. told the authorities that defendant would call her into his bedroom or the bathroom and force her to perform various sexual acts, and that he would beat her if she did not comply with his demands. She also knew that defendant had had sexual relations with her brother, J. W., and her older step-sister, C. C. Both she and C. C. had complained to their mother, who would not "say anything or do anything about it." N. W. further stated that her father's abuse had become so unbearable that she dreaded going home from school every day, and that the last incident had occurred on November 18, 1987. I. W. told a detective that she had been abused by defendant numerous times while living in Walker County, usually in defendant's bedroom or the bathroom while her mother was away; that defendant had fondled her and forced her to have oral sex and masturbate him; that these incidents were becoming more frequent and the last one had occurred about

three weeks ago. J. W., who was then twenty-one, reported to the investigators that defendant had sexually molested him from about age seven to eighteen by sodomizing him both orally and anally. He also knew that C. C. had been sexually abused and that their mother was aware of what was going on but did nothing about it. He stated that he was glad that "it's all out [and] maybe something can happen now."

The two victims were examined by a physician who found that the condition of N. W.'s vagina and her rectal tone were consistent with her statement that she had been engaged in regular vaginal and anal intercourse over a period of years. At a deprivation hearing in juvenile court both girls testified under oath, again recounting the sexual abuse forced upon them by defendant. The juvenile court judge released the girls into their mother's custody following this hearing, defendant having been charged and placed in jail. The girls went to California with their mother where they stayed with their grandmother, and were also reunited with their older step-sister, C. C., who had just returned with her husband from Germany.

C. C. testified at trial that when she learned of the charges against defendant, she told her mother that she wanted to go to Georgia to testify against him, but that her mother became enraged and a week later she left with the victims. Before the younger girls left, C. C. was able to talk to them alone. N. W. did not say much, but I. W. said she had told someone at school about what was happening because N. W. had been crying all night; and that their mother had warned N. W. that they might be taken away from her if they testified against their father. Just before the start of the trial, J. W. called C. C. and told her that if she testified she would be the only one saying the two younger girls had been sexually abused because he and the two victims were going to deny it. He further stated that he and C. C. should have done something about the abuse earlier when it happened to them and "cussed" her out, telling her to "just leave it alone."

The two victims and their mother apparently settled in the Chattanooga, Tennessee, area and, prior to the May 1988 term of court, the District Attorney's office in LaFayette, Georgia, received documents from the victims identified as "affidavits," declaring that their previous allegations of defendant's sexual abuse were untrue and requesting that the charges pending against him be dismissed. On arraignment day in mid-May, the victims and their mother appeared in the office of an investigator for the District Attorney and gave him written statements to the effect that they had made up the allegations of sexual abuse in order to be sent to California.

The prosecution was not dismissed, and on May 27, 1988, defendant filed a demand for trial. However, neither the victims nor their

mother could be found during the May or November terms of court and, because it appeared that they would be unavailable for trial, the State moved to allow the use of the transcript of the victims' testimony in the juvenile court deprivation hearing. After a hearing was held on this motion on January 27, 1989, the trial court ruled that the transcript would be admissible if the victims were unavailable for trial. The trial was set for February 23, 1989, on February 16 the State learned the possible whereabouts of the victims in Chicago, Illinois, and began the statutory process of issuing summons for witnesses outside the state. On February 20, 1989, the jury was selected; on February 21 the two victims and their mother were subpoenaed in Chicago and brought to LaFayette, Georgia, arriving at about 10:30 p.m.

At trial, on February 24, I. W. and N. W. testified that they had made up the allegations of sexual abuse against defendant in order to get to go to California, although they did not explain how this would have enabled them to do so. J. W. testified that he had previously said he was sexually abused to protect the victims and that what defendant had done to him was nobody's business. C. C. testified that on the morning of February 23 before the trial commenced she talked with the mother and the two victims, and although the mother did most of the talking, the two young girls did indicate that they wanted the charges against defendant dropped because they were afraid they would be taken away from their mother and separated. She described in appalling detail the years of sexual abuse she had endured with defendant, and that he had also forced her to have sexual relations with J. W., on occasion participating with them. One time she caught J. W. having anal intercourse with N. W. and stopped them. Although she had complained to her mother nothing was done. However, when she became pregnant by either defendant or J. W., her mother had arranged for her to have an abortion. Defendant denied that he committed any sexual abuse on any of the children.

1. In his first enumeration of error, defendant contends that the trial court erred in refusing to grant his motion for a continuance when the State intentionally concealed the whereabouts of the victims from him in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and similar provisions of the Georgia Constitution. He argues that his inability to interview these witnesses prior to trial deprived him of his fundamental right to plan and present a defense because his trial strategy had been based upon the proposition that the case would be tried on the juvenile court proceedings and hearsay evidence.

Contrary to defendant's assertions, it appears that if anyone concealed the whereabouts of the victims, it was defendant and his wife, not the State. There is absolutely nothing to indicate that the State

improperly misled defense counsel into believing that the girls would not appear at trial. Indeed, the trial judge noted that if defendant had known that the State had located these witnesses, "there was a good chance that that information may have been imparted to them before they were served of this notice under the statute and they may not have been [in court at all]." Furthermore, only one of defendant's two attorneys had not previously interviewed the victims and he was provided that opportunity on the morning before the trial began. The other lawyer had been representing defendant for more than a year since the deprivation hearing was held and not only had he questioned the victims then, but also he had interviewed them several times after that. In any event, since the victims' testimony was more favorable to defendant than to the State, he has not shown any harm or prejudice in the denial of a continuance so as to constitute an abuse of discretion. "The grant or denial of a continuance is within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of discretion. [Cits.] [Defendant] has not shown how additional time would have benefited him or how the lack of time harmed him. . . . [W]e find no error in the trial court's denial of the motion for continuance. [Cit.]" *Davis v. State*, 190 Ga. App. 178, 179 (378 SE2d 519) (1989).

2. During the examination of the DFACS investigator Francis McKnight, the prosecutor sought to elicit information in regard to the custody disposition of the victims after the deprivation hearing in juvenile court by asking him what the result of the hearing was, to which McKnight replied: "the judge made a decision that the girls had been sexually molested." Defendant's motion for mistrial was denied and he cites this as error, contending that allowing the jury to base their verdict upon the decision of another tribunal was a violation of his constitutional rights. While denying a mistrial, the trial court inquired if defendant desired any curative instructions. Although defense counsel argued that curative instructions would be to no avail, he did request the court to instruct the jury to disregard McKnight's statement. The trial court did so and further told the jury that McKnight's statement was not to enter into their verdict whatsoever. When the judge also asked the jurors if any of them could not comply with his instructions none responded, and defendant did not thereafter renew his motion for mistrial or request additional instructions. " 'Since the rule requiring renewal of a motion for a mistrial following curative instructions has been retained in criminal cases, the issue has not been preserved for appellate review. (Cits.)' [Cit.]" *Williamson v. State*, 188 Ga. App. 307, 308 (2) (372 SE2d 685) (1988).

3. Defendant contends that the trial court erred in refusing to merge certain offenses pursuant to OCGA § 16-1-7: (1) the charge of

statutory rape with the incest charge; (2) the charge of child molestation with that of aggravated child molestation; and (3) the charges of aggravated sodomy and aggravated child molestation. Defendant was indicted for the statutory rape of N. W. on or about April 14, 1986, and for incestual intercourse with N. W. on or about November 16, 1987. He was accused of the molestation of I. W. by placing his hand onto and about her vagina on or about October 30, 1987, and the aggravated child molestation of I. W. by placing his penis in her mouth on or about the same date. He was charged with the aggravated molestation of N. W. by placing his penis in her mouth on or about April 14, 1986, and the aggravated sodomy of N. W. by performing a sexual act involving his sex organs and the mouth of N. W.

These multiple offenses did not merge as a matter of fact or law. "Each of these transactions constituted a separate offense since each was established by proof of different facts; i.e., each offense was a completed crime when the next was perpetrated upon the victim. Under the circumstances of this case, the same conduct is not being punished twice nor is one act included in the other so as to proscribe the separate conviction and punishment for each act." (Citations and punctuation omitted.) *Jimmerson v. State*, 190 Ga. App. 759, 762 (4) (380 SE2d 65) (1989). Accord *Stander v. State*, 193 Ga. App. 212 (2) (387 SE2d 422) (1989); *Garrett v. State*, 188 Ga. App. 176 (3) (372 SE2d 506) (1988); *Kirby v. State*, 187 Ga. App. 88 (2) (369 SE2d 274) (1988).

4. Defendant's assertion that his motion for directed verdict of acquittal for the offense of aggravated child molestation of I. W. should have been granted is likewise without merit. " '(A) motion for directed verdict in a criminal (case) should only be granted where there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law.' [Cit.] 'If there is any evidence of guilt, it is for the jury to decide whether that evidence, circumstantial though it may be, is sufficient to warrant a conviction.' [Cit.]" *Lance v. State*, 191 Ga. App. 701, 703-704 (3) (382 SE2d 726) (1989). There was testimony that on many occasions I. W. had been forced to commit oral sex, from which it can only reasonably be deduced that defendant forced her to place her mouth on his penis as charged in the indictment for aggravated child molestation. We find no grounds for reversal.

*Judgment affirmed. Deen, P. J., and Beasley, J., concur.*

DECIDED MAY 1, 1990.

*W. Davis Hentz,* for appellant.

*Ralph L. Van Pelt, Jr., District Attorney*, for appellee.